UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X

JEANETTE BURPOE,                          :

                Plaintiff,     :     18 Civ. 3168 (HBP)

   -against-                              :     OPINION
                                               AND ORDER
NANCY A. BERRYHILL,                        :
Commissioner of Social Security

                                          :

              Defendant.     :

-----------------------------------X

PITMAN, United States Magistrate Judge:

## I. Introduction

Plaintiff brings this action pursuant to section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits ("DIB"). All parties have consented to my exercising plenary jurisdiction pursuant to 28 U.S.C. § 636(c). Plaintiff and the Commissioner have both moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure (Docket Item ("D.I.") 12, 15). For the reasons set forth below, the Commissioner's motion is granted and plaintiff's motion is denied.

II.  Facts[1]

    A.  Procedural Background

On July 16, 2014, plaintiff filed an application for DIB, alleging that she became disabled on February 7, 2014 due to torn ligaments in her left thumb and right wrist, surgery on her left hand, pending surgery on her right hand, pain in her lower back and neck and limited motion with pain in her left knee (Tr. 98, 192).  After her application for benefits was initially denied on October 10, 2014, she requested, and was granted, a hearing before an administrative law judge ("ALJ") (Tr. 97, 105, 110-11, 126-27).

On October 27, 2016, plaintiff and her attorney appeared before ALJ Vincent M. Cascio for a hearing at which plaintiff and a vocational expert testified (Tr. 70-96).  On April 7, 2017, the ALJ issued his decision finding that plaintiff was not disabled (Tr. 51-63).  This decision became the final decision of the Commissioner on February 20, 2018 when the Appeals Council denied plaintiff's request for review (Tr. 1-4). Plaintiff timely commenced this action on April 11, 2018 seeking

---

[1]I recite only those facts relevant to my resolution of the pending motions.  The administrative record that the Commissioner filed pursuant to 42 U.S.C. § 405(g) (see Notice of Filing for Administrative Record, dated July 16, 2018 (D.I. 8) ("Tr.") more fully sets out plaintiff's medical history.

review of the Commissioner's decision (Complaint, dated Apr. 11, 2018 (D.I. 1) ("Compl.")).

B. Social Background

Plaintiff was born on February 4, 1968 and was 46 years old at the time she filed her application for DIB (Tr. 192). Plaintiff is married and lives with her husband in a house in Middletown, New York (Tr. 74, 228). Plaintiff completed tenth grade, but later earned her GED (Tr. 75).

Plaintiff worked as a personal aid for mentally ill individuals from February 2000 until February 7, 2014 -- the alleged onset date of her disability (Tr. 77, 209). Plaintiff stated in her "Disability Report," dated July 17, 2014, that this position required her to assist patients with all aspects of daily living, such as grocery shopping, cleaning, laundry, taking out the garbage and moving furniture (Tr. 210). She further stated that this position frequently required her to stand, walk, stoop, kneel, crouch, reach, handle large objects and lift objects that weighed 10 pounds or more (Tr. 210). Plaintiff testified that she stopped working due to a motor vehicle accident on February 7, 2014 (Tr. 75). Plaintiff was driving home from work when she was hit by another vehicle on the rear right-hand side of her vehicle while stopped at a stop sign (Tr. 273). Plaintiff reported that she was not injured from this impact;

however, when she got out of her car, she slipped on ice and fell on both of her hands and has been in significant pain ever since (Tr. 273).

In her "Function Report", dated August 12, 2014, plaintiff stated that her daily activities included taking care of her dog (and occasionally her grandchild) and having dinner with family and friends; plaintiff claimed that her other social activities were limited by her ongoing pain (Tr. 229, 233). Plaintiff stated that she was able to dress and bathe herself, but that she had difficulty buttoning her shirts, blow drying her hair and shaving her legs because of the pain in her hands (Tr. 229-30). Plaintiff further stated that she was able to clean, do laundry, drive, go outside unassisted, shop for groceries, pay bills and handle her bank accounts (Tr. 231-32). However, at her hearing, plaintiff testified that she needed assistance from her husband to carry out most daily activities, such as laundry, dressing herself, cooking and running errands (Tr. 82-83).

C.  Medical Background

1.  Medical Records for
    the Relevant Time Period

a.  Dr. Ronald Israelski

Plaintiff visited Dr. Ronald Israelski, an orthopedic surgeon, five times between February 10, 2014 and May 12, 2014

4

(Tr. 277-83). While no treatment notes exist from these visits, Dr. Israelski diagnosed plaintiff with a hand sprain and a wrist contusion (Tr. 277-83). He also ordered an MRI of plaintiff's left thumb on February 21, 2014, which revealed no fractures or abnormalities (Tr. 284-85).

### b. Dr. Robert Strauch

Plaintiff visited Dr. Robert Strauch, an orthopedist, on March 20, 2014 complaining of sharp pain in her left thumb and right wrist that she described as a seven out of ten in severity (Tr. 269, 272). Plaintiff exhibited full range of motion in her shoulders and elbows, but her right wrist was limited to 60% rotation due to pain (Tr. 273). Dr. Strauch noted some tenderness over her left thumb metacarpophalangeal ("MP") joint,[2] but that she otherwise exhibited normal sensations and motor function (Tr. 273). Dr. Strauch opined that plaintiff likely had a right triangular fibrocartilage complex ("TFCC") tear[3] and recommended

---

[2]The MP joint, or knuckle, is where the finger bones meet the hand bones. MP Joint Arthritis, American Society for Surgery of the Hand, available at, www.assh.org/handcare/hand-arm-conditions/MP-joint-arthritis (last visited July 10, 2019).

[3]A TFCC tear refers to tears or fraying in the tissues that connect the ulna, one of the two bones in the forearm, to other parts of the wrist. This tear often occurs from a fall onto the wrist or multiple repetitive twisting injuries. It can also result from a developmental difference in the length of the ulna compared with the adjacent radius in the forearm. Ulnar Wrist Pain: Possible Causes, The Cleveland Clinic, available at,
(continued...)

5

that plaintiff continue with physical therapy before any surgical options were considered (Tr. 273-74).

### c. Crystal Run Healthcare

Plaintiff visited multiple doctors at Crystal Run Healthcare ("CRH") between May 6, 2014 through November 14, 2016 for various orthopedic issues in her hands, wrists, knees, back and left shoulder.

Plaintiff visited Dr. Samir Sodha, an orthopedic surgeon, on May 6, 2014 (Tr. 303). Plaintiff exhibited full range of motion in her elbows, shoulders, forearms, wrists and fingers, but reported pain in her wrist with extension (Tr. 303-04). She also exhibited full muscle strength and normal sensations and reflexes (Tr. 304). Her Tinel[4] and other related carpal tunnel tests were negative (Tr. 304). Dr. Sodha reviewed plaintiff's February 21, 2014 MRI and agreed that it revealed no fractures, but opined that there was some joint irregularity and

---

[3](...continued)
https://myclevelandclinic.org/health/symptoms/21035-ulnar-wrist-pain/possible-causes (last visited July 10, 2019).

[4]A Tinel test is a method to test for carpal tunnel syndrome. A positive test is noted when the patient experiences a tingling sensation in the distal end of a limb when percussion, or tapping, is made over the site of a divided nerve in the wrist. A tingling sensation indicates that the nerve is trapped in the tarsal tunnel and can be a sign of carpal tunnel syndrome. Tinel's Test, Physiopedia, available at, https://www.physio-pedia.com/Tinel's_Test (last visited July 10, 2019).

a TFCC tear (Tr. 304). Dr. Sodha diagnosed plaintiff with joint and hand pain and recommended surgery (Tr. 304-05).

Dr. Sodha performed a left thumb interphalangeal joint arthrodesis[5] procedure on plaintiff on June 9, 2014 (Tr. 357-59). Plaintiff was discharged the same day and Dr. Sodha continued to diagnose her with left thumb pain (Tr. 343).

Plaintiff had a post-operative visit with Dr. Sodha on June 19, 2014 and reported that she had some incision discomfort, but that her overall pain had improved (Tr. 301). Dr. Sodha noted that plaintiff was recovering well and prescribed her pain medication (Tr. 301-02).

Plaintiff visited Dr. Sodha again on July 2, 2014 (Tr. 299). There are no treatment notes from that visit, but plaintiff reported that her pain was a four out of ten in severity (Tr. 299).

Plaintiff visited Dr. Sodha again on July 24, 2014 and reported that her pain was a five out of ten (Tr. 297-98). Plaintiff reported some sensitivity at her incision site, but exhibited full range of motion in her fingers and wrists (Tr.

---

[5]Thumb interphalangeal joint arthrodesis procedure is also known as "joint fusion" surgery, a minimally invasive procedure in which the injured joint is fused with the joint below it to stabilize and straighten the joint to relieve pain. Arthritis of the Wrist and Hand: Management and Treatment, The Cleveland Clinic, available at, https://myclevelandclinic.org/health/diseases/7082-arthritis-of-the-wrist-and-hand/management-and-treatment (last visited July 10, 2019).

297).  Plaintiff also underwent an X-Ray of her left thumb at this visit, which revealed no abnormalities (Tr. 306).  Dr. Sodha diagnosed plaintiff with left thumb pain (Tr. 298).

Plaintiff visited Dr. Rocco Bassora, an orthopedic surgeon, on August 6, 2014 and reported left knee pain that she claimed was from her February 7, 2014 fall (Tr. 444).  Plaintiff exhibited full range of motion, normal sensations and reflexes and full muscle strength (Tr. 444-45).  Plaintiff's straight leg raising tests[6] were negative bilaterally, but her McMurray's test[7] was positive (Tr. 445).  Dr. Bassora ordered an MRI which plaintiff underwent on August 11, 2014 (Tr. 442).  This MRI

---

[6]The straight leg raising test is used to assess patients who complain of back pain that radiates down one leg for nerve root irritation.  To conduct a straight leg raising test, the patient must first lie on his or her back and completely relax the affected leg.  Cupping the heel of the foot of that leg, the examiner will gently raise the leg.  If the patient experiences pain when his or her leg is elevated between 30 and 60 degrees, the test is positive, indicating that root irritation is likely; if there is no sensitivity in that range, the test is negative and the patient is unlikely to be suffering from root irritation. A Practical Guide to Clinical Medicine: Musculo-Skeletal Examination, University of California, San Diego School of Medicine, available at https://meded.ucsd.edu/clincalmed/ joints6.htm (last visited July 10, 2019).

[7]The McMurray's test is used to determine the presence of a meniscus tear within the knee. McMurray's Test, Physiopedia, available at, https://www.physio-pedia.com/Tinel's_Test (last visited July 10, 2019)

revealed that plaintiff had a medial meniscus tear[8] in her left knee (Tr. 442).

Plaintiff followed up with Dr. Bassora two days later on August 13, 2014 (Tr. 440). Dr. Bassora agreed that her MRI showed that she had a medial meniscus tear in her left knee and recommended surgery to repair the tear (Tr. 441).

Plaintiff visited Dr. Sodha on August 21, 2014 and reported that the pain in her left thumb was improving with occupational therapy, but that she was having some difficulty gripping with her left hand (Tr. 296). Plaintiff exhibited full range of motion in her fingers and wrists and reported less tenderness over her incision area (Tr. 296). Dr. Sodha opined that plaintiff had no restrictions and that she should continue therapy (Tr. 296).

Dr. Bassora performed arthroscopic left knee surgery on plaintiff on August 26, 2014 (Tr. 367). During the procedure, Dr. Bassora confirmed that plaintiff had a medial meniscus tear and repaired it (Tr. 368). Plaintiff followed up with Dr. Bassora a few days later on September 8, 2014 and reported mild discomfort in her left knee, but no swelling, redness or diffi-

---

[8]A torn meniscus is a tear in the cartilage of the knee. It is one of the most common knee injuries and can be caused by any activity involving forcefully twisting or rotating the knee. Treatments can range from rest and ice to surgical repairs. Torn Meniscus, Mayo Clinic, available at, https://www.mayoclinic.org/diseases-conditions/torn-meniscus/symptoms-causes/syc-20354818 (last visited July 10, 2019).

culty walking (Tr. 437). Dr. Bassora noted that plaintiff's sensations and reflexes were normal and that she was recovering well from surgery (Tr. 438).

Plaintiff visited Dr. Sodha again on October 3, 2014 and reported that her left thumb pain was improving with occupational therapy and that she had more movement in her hand, but that she was still having difficulty gripping and was experiencing tightness and stiffness (Tr. 295). Plaintiff exhibited full range of motion in her fingers and wrists and reported less tenderness over her incision area (Tr. 295). Dr. Sodha opined that plaintiff had no restrictions and that she should continue therapy (Tr. 295).

Plaintiff underwent an electromyogram test ("EMG")[9] at CRH on November 14, 2014 (Tr. 362-63). It is unclear from the record which physician ordered this test, but it revealed that plaintiff had radiculopathy[10] in her lumbar spine[11] without neu

---

[9]An electromyogram test is an electrodiagnostic test that records extracellular activity of skeletal muscles while at rest, during voluntary contractions and electrical stimulation. See See Dorland's Illustrated Medical Dictionary, 602 (32nd ed. 2012) ("Dorland's").

[10]Radiculopathy is any disease of the nerve roots commonly caused by inflammation or impingement of the nerve. Dorland's at 1571.

[11]The lumbar region of the spine is located below the thoracic region and is made up of vertebrae L1 through L5. Anatomy of the Human Spine, Mayfield Brain & Spine, available at https://www.mayfieldclinic.com/PE-AnatSpine.htm (last visited (continued...)

10

ropathy[12] or myopathy[13] (Tr. 363). Plaintiff also underwent an MRI of her lumbar spine on November 18, 2014, which revealed minor disc bulging at L3-L4 and L5-S1 with mild degenerative changes, but no central canal stenosis[14] (Tr. 364).

Plaintiff visited Dr. Sodha again on February 20, 2015 and reported increased pain in her left thumb (Tr. 414). Plaintiff underwent an X-ray during this examination, which revealed good alignment of the thumb (Tr. 414). Plaintiff exhibited full range of motion in her fingers and wrists (Tr. 414). Dr. Sodha opined that plaintiff had no restrictions and that she should continue therapy (Tr. 414).

Plaintiff visited Dr. Thomas Booker, a pain management physician, on February 26, 2015 and reported pain in her neck and back (Tr. 370). Plaintiff described this pain as an eight out of ten and reported that it decreased with medication and increased with prolonged sitting or lying down (Tr. 371). Plaintiff was

---

[11](...continued)
July 10, 2019).

[12]Neuropathy refers to a functional disturbance or pathological change in the peripheral nervous system. Dorland's at 1268.

[13]Myopathy is any disease of the muscle. Dorland's at 1224.

[14]Spinal stenosis is the narrowing of spaces within the spinal cord, which can put pressure on nerves. See Spinal Stenosis Overview, Mayo Clinic, available at, https://www.mayoclinic.org/diseases-conditions/spinal-stenosis/symptoms-causes/syc-20352961 (last visited July 10, 2019).

alert and oriented during her examination and presented with a normal gait[15] (Tr. 372). Plaintiff exhibited a slightly decreased range of motion in her spine, and her straight leg raising tests were negative bilaterally (Tr. 372). Dr. Booker diagnosed plaintiff with lumbar radiculopathy and recommended that she continue with her pain medication (Tr. 371).

Plaintiff visited Dr. Adrienne Saloman, a neurologist, on March 9, 2015 and reported back pain that was radiating down her left leg that she described as a four out of ten (Tr. 375-76). Plaintiff was alert and oriented during her examination and exhibited full muscle strength, except for some weakness in her left leg and left grip (Tr. 376). Her sensations and reflexes were normal (Tr. 376). Dr. Saloman diagnosed plaintiff with lumbar radiculopathy and recommended continued physical therapy (Tr. 376).

Plaintiff visited Dr. Syed A. Husain, a pain management specialist, on April 8, 2015 and reported back pain that was radiating down her left leg that she described as a six out of ten (Tr. 391). Plaintiff further reported that increased, prolonged activity increased her pain and that physical therapy had provided her with mild pain relief (Tr. 391). Plaintiff's straight leg raising tests were negative bilaterally, but she

---

[15]Gait refers to the manner and style of walking. Dorland's at 753.

exhibited some decreased range of motion in her lumbar spine and some tenderness in her hips with movement bilaterally (Tr. 394). Dr. Husain diagnosed plaintiff with sciatica[16] due to displacement of a lumbar disc and recommended steroid injections (Tr. 395). Plaintiff received an epidural steroid injection at L5-S1 on May 15, 2015 (Tr. 381).

Plaintiff followed up with Dr. Husain on August 18, 2015 and reported that her previous injection provided almost complete pain relief for approximately six weeks and she wanted to repeat the procedure (Tr. 385). Plaintiff's straight leg raising tests were negative bilaterally, but she exhibited some decreased range of motion in her lumbar spine and some tenderness in her hips with movement bilaterally (Tr. 388-89). Dr. Husain continued to diagnose plaintiff with sciatica due to displacement of a lumbar disc and recommended continued steroid injections (Tr. 389).

Plaintiff visited Dr. Sodha on October 6, 2015 and reported continued pain and weakness in her left thumb (Tr. 410). Plaintiff exhibited a full range of motion in her fingers and

---

[16]Sciatica refers to pain that radiates along the path of the sciatic nerve, which branches from the lower back through the hips and buttocks and down each leg. Sciatica most commonly occurs when a herniated disk, bone spur on the spine or narrowing of the spine compresses part of the nerve. This causes inflammation, pain and often some numbness in the affected leg. See Sciatica, Mayo Clinic, available at, https://www.mayoclinic.org/diseases-conditions/sciatica/symptoms-causes/syc-20377435 (last visited July 10, 2019).

wrists, but some weakness in her left thumb (Tr. 411). Dr. Sodha recommended continued occupational therapy and anti-inflammatory medication (Tr. 411).

Plaintiff visited Dr. Sodha again on January 19, 2016 and reported continuing left thumb pain (Tr. 404). Plaintiff continued to exhibit a full range of motion in her fingers and wrists, but some weakness in her left thumb (Tr. 405). Dr. Sodha recommended continued occupational therapy and anti-inflammatory medication (Tr. 405).

Plaintiff visited Dr. Sodha again on March 29, 2016 and reported continuing left thumb pain (Tr. 398). Plaintiff exhibited a full range of motion in her fingers and wrists, but some weakness in her left thumb (Tr. 398). Dr. Sodha diagnosed plaintiff with post-traumatic osteoarthritis[17] of the first carpometacarpal joint[18] of the left hand and recommended an MRI of plaintiff's left wrist (Tr. 399). Dr. Sodha also wrote a letter asking for plaintiff to be excused from work until her next appointment (Tr. 401). Plaintiff underwent this MRI of her

---

[17]Post-traumatic osteoarthritis is an inflammation of the joint that occurs due to a physical injury. Post-Traumatic Arthritis, The Cleveland Clinic, available at, https://myclevelandclinic.org/health/diseases/14616-post-traumatic-arthritis (last visited July 10, 2019).

[18]First carpometacarpal joint is the joint that connects the thumb to the hand. Thumb Arthritis, Mayo Clinic, available at, https://www.mayoclinic.org/diseases-conditions/thumb-arthritis/symptoms-causes/syc-20378339 (last visited July 10, 2019).

left wrist on May 10, 2016; it revealed no fractures, joint effusion[19] or lesions (Tr. 422).

Plaintiff visited Dr. Bassora on September 29, 2016 and reported pain in her left shoulder (Tr. 485). Plaintiff exhibited a normal range of motion in her left shoulder, but her Neer's impingment sign[20] and Hawkins test[21] were positive (Tr. 486). Dr. Bassora diagnosed plaintiff with left shoulder bursitis[22] and ordered an MRI (Tr. 486). Plaintiff underwent

---

[19]Joint effusion refers to an abnormally large amount of fluid in the joint. Joint Aspiration, The Cleveland Clinic, available at, https://myclevelandclinic.org/health/treatments/14512-joint-aspiration (last visited July 10, 2019).

[20]The Neer's impingement test is also commonly used to test rotator cuff shoulder impingement. The examiner stabilizes the patient's scapula with one hand, while internally rotating and passively flexing the arm. If the patient reports pain in this position, then the test is positive. Neers Test, Physiopedia, available at, https://www.physio-pedia.com/Neers_Test (last visited July 10, 2019).

[21]The Hawkin's impingement test is commonly used to test rotator cuff shoulder impingement. The examiner places the patient's arm shoulder in 90 degrees of shoulder flexion with the elbow flexed to 90 degrees and then internally rotates the arm. The test is considered to be positive if the patient experiences pain with internal rotation. Hawkins/Kennedy Impingement Test of the Shoulder, Physiopedia, available at, https://www.physio-pedia.com/Hawkins_/_Kennedy_Impingement_Test_of_the_Shoulder (last visited July 10, 2019)

[22]The subacromial bursa lies in the space between the rotator cuff and the shoulder blade that hangs over the shoulder tendons. Bursities occurs when the bursa becomes inflamed. Shoulder Tendinitis, Cleveland Clinic, available at, https://my.clevelandclinic.org/health/diseases/13202-shoulder-tendinitis (last visited July 10, 2019).

this MRI of her left shoulder on September 29, 2016; it revealed no abnormalities (Tr. 489).

Plaintiff visited Dr. Sodha on October 25, 2016 and reported pain in both hands and wrists (Tr. 424). Plaintiff was alert and oriented during her examination and exhibited a full range of motion without pain in her elbows and shoulders (Tr. 426). Plaintiff reported some pain with wrist and forearm extension (Tr. 426). She exhibited full finger flexion and extension, and her muscle strength, sensations and reflexes were normal, except for some weakness noted in her left thumb (Tr. 426-27). Dr. Sodha diagnosed plaintiff with hand muscle weakness, post-traumatic osteoarthritis of the first carpometacarpal joint and a TFCC tear in her right wrist (Tr. 427). Dr. Sodha recommended surgery on plaintiff's right wrist (Tr. 427).

Dr. Sodha also filled out a medical source statement for plaintiff on October 25, 2016 and opined that plaintiff was unable to lift or carry any objects of any weight (Tr. 429). However, he went on to opine that plaintiff could occasionally reach and finger objects with both hands and that she could occasionally handle objects with her right hand (Tr. 431). Dr. Sodha further opined that plaintiff was able to shop, travel, walk, climb stairs at a reasonable pace with use of a single hand rail, prepare simple meals and take care of her personal hygiene (Tr. 434).

Plaintiff visited Dr. Booker on November 14, 2016 and reported neck and back pain that radiated into both legs (Tr. 492). Plaintiff presented with a normal gait and exhibited full range of motion in both legs (Tr. 493). Plaintiff's straight leg raising tests were negative bilaterally, and her sensations were normal (Tr. 493). Dr. Booker ordered an MRI of plaintiff's lumbar spine (Tr. 494).

### d. Dr. Gilbert Jenouri

Plaintiff underwent an orthopedic independent evaluation with Dr. Gilbert Jenouri on September 19, 2014 (Tr. 291). Plaintiff reported left thumb, left knee, right wrist, right thumb, neck and back pain during this evaluation (Tr. 291). Plaintiff stated that she was able to dress and bathe herself, but needed assistance with cleaning, shopping and laundry (Tr. 292). Dr. Jenouri noted that plaintiff was able to rise from the examination table without assistance, but presented with an antalgic gait[23] and had difficulty walking on her heels and toes (Tr. 292).

Plaintiff exhibited full hand and finger dexterity, full range of motion in her hands and full grip strength; however, she was unable to flex her left thumb due to her recent

---

[23]Antalgic gait refers to a manner of walking in which a limp is adopted in order to avoid pain on weight bearing structures. See Dorland's at 753.

17

surgery (Tr. 292-93). Plaintiff's straight leg raising tests were positive and she exhibited some limited range of motion in her thoracic[24] and lumbar spine (Tr. 293). Plaintiff's reflexes, muscle strength and sensations were normal, except for some tenderness and decreased sensation over her left knee (Tr. 293).

Dr. Jenouri diagnosed plaintiff with neck, lower back, left thumb, left knee, right wrist and right thumb pain, and with bilateral lower extremity radiculopathy (Tr. 294). Dr. Jenouri opined that plaintiff's condition was stable and she had moderate restrictions with bending, climbing stairs, lifting, carrying and walking, standing or sitting for long periods of time (Tr. 294).

e. Pamela Baltsas, D.C.

Plaintiff visited Pamela Baltsas, a licensed chiropractor, for an independent evaluation on October 15, 2014 (Tr. 449). Plaintiff reported neck, back, shoulder, hand and left knee pain during this evaluation (Tr. 451). Plaintiff exhibited a slightly decreased range of motion in her cervical[25] and lumbar spine (Tr. 452). Plaintiff exhibited full muscle strength and normal reflexes and sensations (Tr. 452-53).

---

[24]The thoracic region of the spine is located below the cervical region and consists of vertebrae T1 through T12. Anatomy of the Human Spine, supra.

[25]The cervical region of the spine is located closest to the skull and is made up of vertebrae C1 through C7. Anatomy of the Human Spine, supra.

Plaintiff's straight leg raising tests were negative bilaterally from the seated position, but positive bilaterally from the supine position (Tr. 452).

Baltsas diagnosed plaintiff with resolving cervical, thoracic and lumbar spine sprains and opined that plaintiff could return to work if she refrained from repetitive overhead activities, lifting objects over 25 pounds and prolonged walking, standing or sitting (Tr. 453). Baltsas recommended six weeks of chiropractic treatment (Tr. 453).

### f. Dr. Edward L. Mills

Plaintiff visited Dr. Edward L. Mills, an orthopedic surgeon, for an independent medical examination on October 16, 2014 (Tr. 473). Plaintiff reported neck, back, wrist, knee and left thumb pain during this examination (Tr. 474). Plaintiff further reported that she was unable to stand for more than ten minutes, unable to sit in one position for more than five minutes and unable to garden, wash dishes, drive, do laundry, clean, cook or shop (Tr. 474). Plaintiff presented with antalgic gait and exhibited a slightly decreased range of motion in her cervical and lumbar spine (Tr. 475-76). Her straight leg raising tests were negative bilaterally and she exhibited full muscle strength and normal reflexes and sensations (Tr. 476). Plaintiff exhib-

ited a decreased range of motion in both wrists and knees (Tr. 476-77).

Dr. Mills diagnosed plaintiff with resolved cervical, thoracic and lumbar sprains, right wrist internal derangement, a left wrist sprain and a right knee sprain, and recommended six weeks of physical therapy (Tr. 477). Dr. Mills opined that plaintiff could return to work if she refrained from lifting objects over 25 pounds, repetitive activities using both wrists and prolonged or repetitive standing, kneeling, squatting, using stairs, walking or running (Tr. 477).

Plaintiff visited Dr. Mills for a second independent medical examination on December 18, 2014 (Tr. 467). Plaintiff reported that her symptoms had worsened since her last examination (Tr. 468). She now complained of left leg, groin and jaw pain, and reported that she was experiencing blurred vision and had difficulty sleeping (Tr. 468). Plaintiff exhibited a decreased range of motion in her lumbar spine, left knee and wrists bilaterally (Tr. 470). Her straight leg raising tests were negative bilaterally, and she had full muscle strength in her legs, but exhibited decreased sensations (Tr. 470).

Dr. Mills diagnosed plaintiff with a resolved lumbar sprain, a resolved right knee sprain and right wrist internal derangement (Tr. 471). Dr. Mills opined that plaintiff could not return to work, but could continue with daily activities if she

refrained from bending, lifting objects over 25 pounds, twisting, repetitive activities using her wrists bilaterally and prolonged or repetitive standing, kneeling, squatting, climbing stairs, walking or running (Tr. 472).

Plaintiff visited Dr. Mills for a third independent medical examination on March 12, 2015 and reported lower back and bilateral hand pain (Tr. 463). Plaintiff exhibited a decreased range of motion in her lumbar spine, left knee and wrists bilaterally (Tr. 464-65). Her straight leg raising tests were negative bilaterally; she had full muscle strength in her legs, but exhibited decreased sensations (Tr. 464). Dr. Mills diagnosed plaintiff with a resolved lumbar sprain with underlying degenerative changes and right wrist internal derangement (Tr. 465). Dr. Mills opined that plaintiff could return to work with the restrictions of no repetitive use of both wrists and no heavy lifting (Tr. 465).

### g. David Drier

Plaintiff visited David Drier, a licensed chiropractor, for an independent evaluation on December 23, 2014 (Tr. 456). Plaintiff reported left knee, left thumb, right wrist and lower back pain during this evaluation (Tr. 458). Plaintiff exhibited a slightly decreased range of motion in her spine, and her straight leg raising test was positive on her left side (Tr.

458). Plaintiff exhibited full muscle strength, and her reflexes and sensations were normal (Tr. 458). Drier diagnosed plaintiff with a status-post lumbar sprain and pre-existing cervical degenerative changes (Tr. 459). He opined that plaintiff could perform her normal daily and work activities if she refrained from lifting objects over 25 pounds, sitting for longer than 25 minutes at a time and repetitive bending (Tr. 459). Drier did not believe that plaintiff would benefit from chiropractic treatment (Tr. 459).

### h. Dr. Paul Gordon

Plaintiff visited Dr. Paul Gordon, a psychiatrist, for a psychiatric evaluation on August 30, 2016 (Tr. 479). Plaintiff reported difficulty concentrating, insomnia and restlessness during her evaluation (Tr. 479). Dr. Gordon noted that plaintiff was alert and oriented during her examination, her thought process was logical, her mood was appropriate and she exhibited good insight and judgment (Tr. 479). Dr. Gordon diagnosed plaintiff with possible attention deficit hyperactivity disorder

("ADHD")[26] and insomnia (Tr. 478). Dr. Gordon instructed plaintiff to follow up with him in two weeks (Tr. 478).

### D. Proceedings Before the ALJ

#### 1. Plaintiff's Testimony

Plaintiff testified that she was still experiencing significant pain in her left knee and lower back and that she was only able to walk, stand or sit for approximately five minutes at a time (Tr. 79-80). Plaintiff further testified that she had no gripping ability in her left hand and was also severely limited with grasping objects in her right hand (Tr. 78-81). She claimed that she was unable to pick up objects with her left hand and had difficulty even writing or holding a pen in her right hand (Tr. 80-81). Plaintiff further testified that she was also unable to bend (Tr. 80-81). Plaintiff stated that she was depressed about not being able to work (Tr. 81-82).

Plaintiff claimed that she spent most days trying to watch television or read, but spent a large portion of her day napping because of her insomnia (Tr. 83). Plaintiff testified

---

[26]ADHD is a mental health disorder that includes a combination of persistent problems, such as difficulty paying attention, hyperactivity and impulsive behavior. ADHD, Mayo Clinic, available at, https://www.mayoclinic.org/diseases-conditions/adult-adhd/symptoms-causes/syc-20350878 (last visited July 11, 2019).

that she took a trip to Aruba in 2015, but found the plane ride to be extremely difficult (Tr. 84).

## 2. Vocational Expert's Testimony

Vocational expert Michele Erbacher ("the VE") also testified at the hearing. The VE testified that plaintiff's past work, described in the United States Department of Labor's Dictionary of Occupational Titles ("DOT") as a personal care aid, DOT Code 354.377-014, was considered medium, semi-skilled work (Tr. 90). The ALJ asked the VE to consider possible jobs for a hypothetical person of plaintiff's age, education and work background, who was limited to a range of light work[27] that involved never crawling, handling objects with the left hand, climbing ladders, ropes or scaffolds or working at unprotected heights, and only occasional stooping, crouching, kneeling, handling and fingering objects with the right hand and wrist and fingering objects with the left hand (Tr. 91). The VE testified that such a hypothetical individual could not perform plaintiff's

---

[27]The regulations define "light work" as work which

> involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.

20 C.F.R. § 404.1567(b).

past work as a personal care aid (Tr. 91). The VE testified that such an individual could, however, work in jobs such as an usher, DOT Code 344.677-014, with 18,000 jobs nationally and an investigator for dealer accounts for car dealerships, DOT Code 241.367-038, with 7,000 jobs nationally (Tr. 92). The VE further testified that if such a hypothetic individual were limited to sedentary work with the above discussed limitations, no jobs would exist because bilateral manipulation would be required for any such position (Tr. 92-93).

III.  Analysis

A.  Applicable
Legal Principles

1.  Standard of Review

The Court may set aside the final decision of the Commissioner only if it is not supported by substantial evidence or if it is based upon an erroneous legal standard. 42 U.S.C. § 405(g); Lockwood v. Comm'r of Soc. Sec. Admin., 914 F.3d 87, 91 (2d Cir. 2019); Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2014) (per curiam); Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012); Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008). Moreover, the court cannot "affirm an administrative action on grounds different from those considered by the agency."

Lesterhuis v. Colvin, 805 F.3d 83, 86 (2d Cir. 2015), quoting Burgess v. Astrue, supra, 537 F.3d at 128.

The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence. Byam v. Barnhart, 336 F.3d 172, 179 (2d Cir. 2003), citing Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision." Ellington v. Astrue, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009) (Marrero, D.J.). However, "where application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration." Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

"'Substantial evidence' is 'more than a mere scintilla. It means such evidence as a reasonable mind might accept as adequate to support a conclusion.'" Talavera v. Astrue, supra, 697 F.3d at 151, quoting Richardson v. Perales, 402 U.S. 389, 401 (1971). Consequently, "[e]ven where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings 'must be given conclusive effect' so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam), quoting Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982).

Thus, "[i]n determining whether the agency's findings were supported by substantial evidence, 'the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'" Selian v. Astrue, supra, 708 F.3d at 417 (citation omitted).

### 2. Determination
### Of Disability

A claimant is entitled to DIB if she can establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months."[28]  42 U.S.C. § 423(d)(1)(A); see Barnhart v. Walton, 535 U.S. 212, 217-22 (2002) (both impairment and inability to work must last twelve months).  The impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic techniques," 42 U.S.C. § 423(d)(3), and it must be

> of such severity that [the claimant] is not only unable to do [her] previous work but cannot, considering [the claimant's] age, education, and work experience, engage

---

[28]The standards that must be met to receive SSI benefits under Title XVI of the Act are the same as the standards that must be met in order to receive DIB under Title II of the Act. Barnhart v. Thomas, 540 U.S. 20, 24 (2003).  Accordingly, cases addressing the former are equally applicable to cases involving the latter.

27

> in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether
> such work exists in the immediate area in which [the
> claimant] lives, or whether a specific job vacancy
> exists for [the claimant], or whether [the claimant]
> would be hired if [the claimant] applied for work.

42 U.S.C. § 423(d)(2)(A). In addition, to obtain DIB, the
claimant must have become disabled between the alleged onset date
and the date on which he was last insured. See 42 U.S.C. §§
416(i), 423(a); 20 C.F.R. §§ 404.130, 404.315; McKinstry v.
Astrue, 511 F. App'x 110, 111 (2d Cir. 2013) (summary order),
citing Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008). In
making the disability determination, the Commissioner must
consider: "'(1) the objective medical facts; (2) diagnoses or
medical opinions based on such facts; (3) subjective evidence of
pain or disability testified to by the claimant or others; and
(4) the claimant's educational background, age, and work experi-
ence.'" Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (per
curiam), quoting Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir.
1983) (per curiam).

     In determining whether an individual is disabled, the
Commissioner must follow the five-step process required by the
regulations. 20 C.F.R. § 404.1520(a)(4)(i)-(v); see Selian v.
Astrue, supra, 708 F.3d at 417-18; Talavera v. Astrue, supra, 697
F.3d at 151. The first step is a determination of whether the
claimant is engaged in substantial gainful activity ("SGA"). 20
C.F.R. § 404.1520(a)(4)(i). If she is not, the second step

requires determining whether the claimant has a "severe medically determinable physical or mental impairment." 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant does not have a severe medically determinable impairment or combination of impairments, she is not disabled. See Henningsen v. Comm'r of Soc. Sec. Admin., 111 F. Supp. 3d 250, 264 (E.D.N.Y. 2015); 20 C.F.R. § 404.1520(c). If she does, the inquiry at the third step is whether any of claimant's impairments meet one of the listings in Appendix 1 of the regulations. 20 C.F.R. § 404.1520(a)(4)(iii). If the answer to this inquiry is affirmative, the claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(iii).

If the claimant does not meet any of the listings in Appendix 1, step four requires an assessment of the claimant's residual functional capacity ("RFC") and whether the claimant can still perform her past relevant work given her RFC. 20 C.F.R. § 404.1520(a)(4)(iv); see Barnhart v. Thomas, supra, 540 U.S. at 24-25. If she cannot, then the fifth step requires assessment of whether, given the claimant's RFC, she can make an adjustment to other work. 20 C.F.R. § 404.1520(a)(4)(v). If she cannot, she will be found disabled. 20 C.F.R. § 404.1520(a)(4)(v).

RFC is defined in the applicable regulations as "the most [the claimant] can still do despite her limitations." 20 C.F.R. § 404.1545(a)(1). To determine RFC, the ALJ "'identif[ies] the individual's functional limitations or re-

strictions and assess[es] . . . her work-related abilities on a function-by-function basis, including the functions in paragraphs (b),(c), and (d) of 20 [C.F.R. §] 404.1545 . . . .'" Cichocki v. Astrue, 729 F.3d 172, 176 (2d Cir. 2013) (per curiam), quoting Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *1 (July 2, 1996). The results of this assessment determine the claimant's ability to perform the exertional demands of sustained work which may be categorized as sedentary, light, medium, heavy or very heavy.[29]  20 C.F.R. § 404.1567; see Schaal v. Apfel, 134 F.3d 496, 501 n.6 (2d Cir. 1998). This ability may then be found to be limited further by nonexertional factors that restrict the claimant's ability to work.[30]  See Michaels v. Colvin, 621 F. App'x 35, 38 n.4 (2d Cir. 2015) (summary order); Zabala v. Astrue, 595 F.3d 402, 410-11 (2d Cir. 2010).

The claimant bears the initial burden of proving disability with respect to the first four steps. Once the claimant has satisfied this burden, the burden shifts to the

---

[29]Exertional limitations are those which "affect only [the claimant's] ability to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing, and pulling)." 20 C.F.R. § 404.1569a(b).

[30]Nonexertional limitations are those which "affect only [the claimant's] ability to meet the demands of jobs other than the strength demands," including difficulty functioning because of nervousness, anxiety or depression, maintaining attention or concentration, understanding or remembering detailed instructions, seeing or hearing, tolerating dust or fumes, or manipulative or postural functions, such as reaching, handling, stooping, climbing, crawling or crouching.  20 C.F.R. § 404.1569a(c).

Commissioner to prove the final step -- that the claimant's RFC allows the claimant to perform some work other than her past work. <u>Selian v. Astrue</u>, <u>supra</u>, 708 F.3d at 418; <u>Burgess v. Astrue</u>, <u>supra</u>, 537 F.3d at 128; <u>Butts v. Barnhart</u>, 388 F.3d 377, 383 (2d Cir. 2004), <u>amended in part on other grounds on reh'g</u>, 416 F.3d 101 (2d Cir. 2005).

In some cases, the Commissioner can rely exclusively on the Medical-Vocational Guidelines (the "Grids") contained in C.F.R. Part 404, Subpart P, Appendix 2 when making the determination at the fifth step. <u>Gray v. Chater</u>, 903 F. Supp. 293, 297-98 (N.D.N.Y. 1995). "The Grid[s] take[] into account the claimant's RFC in conjunction with the claimant's age, education and work experience. Based on these factors, the Grid[s] indicate[] whether the claimant can engage in any other substantial gainful work which exists in the national economy." <u>Gray v. Chater</u>, <u>supra</u>, 903 F. Supp. at 298; <u>see</u> <u>Butts v. Barnhart</u>, <u>supra</u>, 388 F.3d at 383.

Exclusive reliance on the Grids is not appropriate where nonexertional limitations "significantly diminish [a claimant's] ability to work." <u>Bapp v. Bowen</u>, 802 F.2d 601, 603 (2d Cir. 1986); <u>accord</u> <u>Butts v. Barnhart</u>, <u>supra</u>, 388 F.3d at 383. "Significantly diminish" means "the additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of

31

a meaningful employment opportunity." Bapp v. Bowen, supra, 802 F.2d at 606 (footnote omitted); accord Selian v. Astrue, supra, 708 F.3d at 421; Zabala v. Astrue, supra, 595 F.3d at 411. Before an ALJ determines that sole reliance on the Grids is proper in determining whether a plaintiff is disabled under the Act, he must ask and answer the intermediate question -- whether the claimant has nonexertional limitations that significantly diminish her ability to work; an ALJ's failure to explain how he reached his conclusion to this question is "plain error". See Maldonado v. Colvin, 15 Civ. 4016 (HBP), 2017 WL 775829 at *21-*23 (S.D.N.Y. Feb. 23, 2017) (Pitman, M.J.); see also Bapp v. Bowen, supra, 802 F.2d at 606 ; St. Louis ex rel. D.H. v. Comm'r of Soc. Sec., 28 F. Supp. 3d 142, 148 (N.D.N.Y. 2014); Baron v. Astrue, 11 Civ. 4262 (JGK)(MHD), 2013 WL 1245455 at *19 (S.D.N.Y. Mar. 4, 2013) (Dolinger, M.J.) (Report & Recommendation), adopted at, 2013 WL 1364138 (S.D.N.Y. Mar. 26, 2013) (Koeltl, D.J.). When the ALJ finds that the nonexertional limitations do significantly diminish a claimant's ability to work, then the Commissioner must introduce the testimony of a vocational expert or other similar evidence in order to prove "that jobs exist in the economy which [the] claimant can obtain and perform." Butts v. Barnhart, supra, 388 F.3d at 383-84 (internal quotation marks omitted); see Heckler v. Campbell, 461 U.S. 458, 462 n.5 (1983) ("If an individual's capabilities are not described accurately by

a rule, the regulations make clear that the individual's particu-
lar limitations must be considered.").

B.   The ALJ's Decision

The ALJ applied the five-step analysis described above
and determined that plaintiff was not disabled (Tr. 51-63).

As an initial matter, the ALJ found that plaintiff met
the insured status requirements of the Act through December 31,
2019 (Tr. 53).

At step one, the ALJ found that plaintiff had not
engaged in SGA since February 7, 2014 (Tr. 53).

At step two, the ALJ concluded that plaintiff suffered
from the severe impairments of (1) status-post left thumb
interphalangeal joint arthrodesis, (2) left hand osteoarthritis,
(3) lumbar spine degenerative disc disease, (4) chronic L2-L3
radiculopathy, (5) status-post left knee arthroscopic surgery,
(6) a right wrist TFCC tear and (7) left wrist fluid with possi-
ble ganglion cyst[31] (Tr. 53).  The ALJ also concluded that plain-

---

[31]Ganglion cysts are noncancerous lumps that most commonly
develop along the tendons or joints of the wrists.  They are
typically round or oval and are filled with a jellylike fluid.
Ganglion cysts can be painful if they press on a nearby nerve and
can sometimes interfere with joint movement.  Ganglion Cyst, Mayo
Clinic, available at, https://www.mayoclinic.org/diseases-
conditions/ganglion-cyst/symptoms-causes/syc-20351156 (last
visited July 11, 2019).

tiff suffered from the non-severe impairments of left shoulder
bursitis and ADHD (Tr. 53-55).

At step three, the ALJ found that plaintiff's impair-
ments did not meet or medically equal the criteria of the listed
impairments and that plaintiff was not, therefore, entitled to a
presumption of disability (Tr. 55). In reaching his conclusion,
the ALJ stated that he gave specific consideration to Listings
1.02, 1.04, 12.04, 12.06 and 12.11 (Tr. 55).

The ALJ then determined that plaintiff retained the RFC
to perform light work with the following limitations:

> [Plaintiff] can occasionally climb ramps/stairs;
> occasionally balance, stoop, crouch and kneel; no
> crawling; and, no climbing ladders, ropes, or scaf-
> folds. [She] must avoid protected heights, vibrations,
> and hazardous machinery. [She] can occasionally handle
> and finger with the right wrist and hands. [She] cannot
> handle with the left hand but is able to use her left
> hand as a guide. [She] can occasionally finger with the
> left hand(Tr. 55-56).

To reach his RFC determination, the ALJ examined the opinions of
the treating and consulting physicians and determined the weight
to be given to each opinion based on the objective medical record
(Tr. 59-61).

The ALJ afforded "some weight" to Dr. Jenouri's opinion
that plaintiff had "moderate restrictions for walking, standing,
sitting [for] long periods, bending, climbing stairs, lifting,
and carrying" because, "[w]hile his opinion [was] generally
consistent with findings upon his examination, he did not have

34

the benefit of reviewing additional records received at the hearing" (Tr. 59).

The ALJ afforded "little weight" to Dr. Sodha's May 29, 2016 opinion that plaintiff was "unable to work for 6-8 weeks" because "the ability to work is an issue reserved to the Commissioner" (Tr. 59). The ALJ gave "partial weight" to Dr. Sodha's October 25, 2016 opinion that plaintiff could "occasionally reach, handle and finger bilaterally", "never handle with the left hand", "frequently use foot controls", "never climb ladders or scaffolds or crawl" and "never work around unprotected heights, moving mechanical parts or vibrations" because it was "consistent with findings on examinations and [plaintiff's] treatment history (Tr. 59-60). However, he afforded "less weight" to the portion of that opinion that plaintiff could "never lift/carry any weight" because plaintiff's physical examination from that date revealed that she had "5/5 strength in the upper and lower extremities", the opinion was "internally inconsistent" and it was inconsistent with the overall record (Tr. 60).

The ALJ afforded "partial weight" to the opinion of chiropractor Baltsas that plaintiff "could return to work with [the] restrictions of no overhead repetitive activities, no prolonged walking, standing, [or] sitting and no heavy lifting over 25 pounds" because "[a]lthough not a recognized medical

35

source, the opinion [was] consistent with the results of a thorough examination" and consistent with plaintiff's medical imaging of the lumbar spine (Tr. 60).

The ALJ afforded "partial weight" to the opinion of chiropractor Drier that plaintiff "had a mild to moderate spinal disability and may perform her usual work and daily activities, with restrictions of no lifting over 25 pounds, no sitting over 25 minutes at a time, and no repetitive bending" because "[a]lthough not a recognized medical source, the opinion [was] consistent with the results of a thorough examination" (Tr. 60).

The ALJ afforded "great weight" to Dr. Mills' March 12, 2015 opinion that plaintiff could "work and perform daily activities with restrictions of no repetitive use of both hands/wrists and no heavy lifting" and "great weight" to his December 18, 2014 opinion that plaintiff was "unable to return to work, but could perform her daily activities with restrictions of no bending, lifting over 20-25 pounds, twisting, repetitive activities of wrists/hands, [and] prolonged sitting, kneeling, squatting, walking, running, or using stairs." The ALJ also afforded "great weight" to Dr. Mills' October 16, 2014 opinion that plaintiff "was capable of working with restrictions of lifting over 25 pounds, repetitive activities using bilateral wrists/hands, standing, kneeling, squatting, using stairs, walking and running" (Tr. 60-61). The ALJ found that these

opinions were consistent with Dr. Mills' physical examinations of
plaintiff, with the overall medical record and with the "findings
of normal sensation over the ulnar/median/superficial radial
nerve distributions, 5/5 strength to muscles, good range of
motion of the wrist with only some thumb weakness and minimal
tenderness at the fusion site" (Tr. 60-61).

The ALJ also considered the imaging and diagnostic
studies of plaintiff's hand, wrists, spine and knee, plaintiff's
thumb and knee surgeries, her claims of depression and ADHD, her
treatment with Dr. Strauch and Dr. Isrealski after her motor
vehicle accident, her treatment with the other physicians at CRH
-- Drs. Booker, Salomon, Husain and Bassora -- and plaintiff's
testimony in determining her RFC (Tr. 56-58). The ALJ found that
while plaintiff's medically determinable impairments could
reasonably have caused her alleged symptoms, her statements
concerning the intensity, persistence and limiting effects of
these symptoms were not entirely consistent with the medical
evidence and other evidence in the record (Tr. 58).

At step four, the ALJ concluded that plaintiff could
not perform her past relevant work as a personal care aide
because the VE had defined that job as a medium exertion position
as it is performed in the national economy (Tr. 61).

At step five, relying on the testimony of the VE, the
ALJ found that jobs existed in significant numbers in the na-

37

tional economy that plaintiff could perform, given her RFC, age and education (Tr. 62-63).

## C. Analysis of
### the ALJ's Decision

Plaintiff contends that the ALJ's disability determination was erroneous because in reaching his RFC determination, the ALJ (1) violated the treating physician rule, (2) failed to develop the record adequately and (3) failed to assess properly plaintiff's credibility and subjective complaints (Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Administrative Record and Pleadings, dated Sept. 14, 2018 (D.I. 13) ("Pl. Memo.")). The Commissioner contends that the ALJ's decision was supported by substantial evidence and should be affirmed (Memorandum of Law in Support of Defendant's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Judgment on the Pleadings, dated Nov. 13, 2018 (D.I. 16) ("Def. Memo.")).

As described above, the ALJ went through the sequential process required by the regulations. The ALJ's analysis at steps one, two and four were decided in plaintiff's favor, and the Commissioner has not challenged those findings. I shall, therefore, limit my discussion to addressing whether the ALJ's analysis at step three complied with the applicable legal standards and was supported by substantial evidence.

1. Step 3: the ALJ's
   RFC Determination

The ALJ found that plaintiff had the RFC to perform
light work and was limited to never crawling, working at unpro-
tected heights or with vibrations or hazardous machinery, climb-
ing ladders, ropes or scaffolds or handling objects with the left
hand, and only occasionally climbing ramps or stairs, balancing,
stooping, crouching, kneeling, handling or fingering objects with
the right hand and fingering objects with the left hand (Tr. 55-
56). The ALJ's RFC finding is supported by substantial evidence.

The majority of the evidence in the record supports a
RFC of light work with the above described limitations. On
September 19, 2014, Dr. Jeanouri opined that plaintiff had
"moderate restrictions" on her ability to bend, climb stairs,
lift, carry, walk and stand or sit for prolonged periods of time
(Tr. 294). All three of Dr. Mills' opinions noted similar
moderate restrictions, such as, the prohibition against repeti-
tive use of wrists or hands, lifting objects over 25 pounds and
repetitive or prolonged standing, kneeling, squatting, walking or
running (Tr. 465, 472, 477). On October 25, 2016, Dr. Sodha
opined that plaintiff could occasionally reach for and finger
objects with both hands, occasionally handle objects with her
right hand, but never handle objects with her left hand (Tr.
431). He further opined that she was able to walk and climb

stairs at a "reasonable pace" (Tr. 434). Although not recogniz-

able medical sources, chiropractors Baltsas and Drier both opined

that plaintiff had moderate limitations consistent with a light

RFC, namely, that plaintiff was unable to engage in repetitive

overhead activities, could not lift objects over 25 pounds and

could not engage in prolonged walking, bending, standing or

sitting (Tr. 453, 459).

These opinions are all consistent with an RFC to do

light work. See 20 C.F.R. § 404.1567(b) ("Light work involves

lifting no more than 20 pounds at a time with frequent lifting or

carrying objects weighing up to 10 pounds."); accord Revi v.

Comm'r of Soc. Sec., 16 Civ. 8521 (ER)(DF), 2018 WL 1136997 at

*30 (S.D.N.Y. Jan. 30, 2018) (Freeman, M.J.) (Report &

Recommendation), adopted at, 2018 WL 1135400 (S.D.N.Y. Feb. 28,

2018) (Ramos, D.J.) (ALJ's RFC finding of light work was consis-

tent with consulting examiner's opinion that "plaintiff had only

moderate lifting and carrying limitations"); Crews v. Astrue, 10

Civ. 5160 (LTS)(FM), 2012 WL 1107685 at *17 (S.D.N.Y. Mar. 27,

2012) (Maas, M.J.) (Report & Recommendation), adopted at, 2012 WL

2122344 (S.D.N.Y. June 12, 2012) (Swain, D.J.) (ALJ's RFC finding

of light work was consistent with consulting examiner's opinion

that plaintiff "suffered from only mild-to-moderate limitations

with bending, lifting, carrying, . . . prolonged periods of

sitting, standing, or climbing stairs."); Carpenter v. Astrue,

09-CV-0079 (RJA), 2010 WL 2541222 at *5-*6 (W.D.N.Y. June 18, 2010) (ALJ's RFC finding of light work was consistent with consulting examiner's opinion that "plaintiff had only a moderate limitation in prolonged walking, standing, kneeling, and climbing.").

The ALJ's RFC finding is also supported by the objective medical evidence in the record. Plaintiff's February 21, 2014 left thumb MRI revealed no fractures, but because Dr. Sodha opined that it showed a TFCC tear, Dr. Sodha surgically repaired it on June 9, 2014 (Tr. 284-85, 357-59). This surgical repair appeared to be successful considering plaintiff exhibited full range of motion in her wrists and fingers at follow-up appointments with Dr. Sodha on July 24, 2014, August 21, 2014, October 3, 2014, February 20, 2015, October 6, 2015, January 19, 2016 and March 29, 2016 (Tr. 297, 296, 295, 414, 411, 405, 398). Plaintiff's May 10, 2016 left wrist MRI also revealed no fractures, joint effusion or lesions (Tr. 422). However, because Dr. Sodha noted some weakness over plaintiff's left thumb and plaintiff continued to report pain and difficulty gripping, the ALJ considered these limitations by finding that plaintiff could never handle objects with her left hand and could only occasionally finger objects with her left hand (Tr. 55-56).

With respect to plaintiff's left knee, Dr. Bassora repaired plaintiff's medial meniscus tear on August 26, 2014 (Tr.

367). While plaintiff reported some residual pain and decreased sensations from this surgery, she reported no difficulty walking and she exhibited full muscle strength and normal reflexes in her knee at subsequent consultative examinations on September 19, 2014, October 15, 2014, October 16, 2014, December 18, 2014, December 23, 2014 and March 12, 2015 (Tr. 293, 437-38, 452-53, 458, 464, 470, 476). Notably, plaintiff also never sought additional treatment from Dr. Bossora or any other orthopedic surgeon specifically for her left knee after this surgery.

Finally, although plaintiff was diagnosed with radiculopathy and exhibited decreased range of motion in her lumbar spine, her November 18, 2014 MRI revealed only minor disc bulging and no central canal stenosis, and she consistently had negative straight leg raising tests throughout the relevant period (Tr. 364).

### a. The Treating Physician Rule

Plaintiff contends that the ALJ violated the treating physician when determining her RFC because he failed to provide "good reasons" for affording "little weight" to Dr. Sodha's March 29, 2016 opinion that plaintiff was unable to work for six to eight weeks and his October 25, 2016 opinion that plaintiff was unable to lift or carry objects of any weight (Pl. Memo. at 14-15).

42

In considering the evidence, the ALJ must afford deference to the opinions of a claimant's treating physicians. A treating physician's opinion will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in . . . [the] record." 20 C.F.R. § 404.1527(c)(2);[32] see also Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000); Diaz v. Shalala, 59 F.3d 307, 313 n.6 (2d Cir. 1995); Schisler v. Sullivan, 3 F.3d 563, 567 (2d Cir. 1993).

"[G]ood reasons" must be given for declining to afford a treating physician's opinion controlling weight. 20 C.F.R. § 404.1527(c)(2); Schisler v. Sullivan, supra, 3 F.3d at 568; Burris v. Chater, 94 Civ. 8049 (SHS), 1996 WL 148345 at *4 n.3 (S.D.N.Y. Apr. 2, 1996) (Stein, D.J.). The Second Circuit has noted that it "'do[es] not hesitate to remand when the Commissioner has not provided "good reasons" for the weight given to a treating physician[']s opinion.'" Morgan v. Colvin, 592 F. App'x 49, 50 (2d Cir. 2015) (summary order), quoting Halloran v. Barnhart, 362 F.3d 28, 33 (2d Cir. 2004); accord Greek v. Colvin, 802 F.3d 370, 375 (2d Cir. 2015).

---

[32]The SSA adopted regulations that alter the standards applicable to the review of medical opinion evidence with respect to claims filed on or after March 27, 2017. See 20 C.F.R. § 404.1520c. Because plaintiff's claim was filed before that date, those regulations do not apply here.

As long as the ALJ provides "good reasons" for the weight accorded to the treating physician's opinion and the ALJ's reasoning is supported by substantial evidence, remand is unwarranted. See Halloran v. Barnhart, supra, 362 F.3d at 32-33; see also Atwater v. Astrue, 512 F. App'x 67, 70 (2d Cir. 2013); Petrie v. Astrue, 412 F. App'x 401, 406-07 (2d Cir. 2011) (summary order); Kennedy v. Astrue, 343 F. App'x 719, 721 (2d Cir. 2009) (summary order). "The opinions of examining physicians are not controlling if they are contradicted by substantial evidence, be that conflicting medical evidence or other evidence in the record." Krull v. Colvin, 669 F. App'x 31, 32 (2d Cir. 2016) (summary order) (citation omitted); see also Monroe v. Comm'r of Soc. Sec., 676 F. App'x 5, 7 (2d Cir. 2017) (summary order). The ALJ is responsible for determining whether a claimant is "disabled" under the Act and need not credit a treating physician's determination on this issue if it is contradicted by the medical record. See Wells v. Comm'r of Soc. Sec., 338 F. App'x 64, 66 (2d Cir. 2009) (summary order).

With respect to Dr. Sodha's first opinion, the ALJ afforded "little weight" to a letter Dr. Sodha wrote that excused plaintiff from work until her next appointment in approximately six to eight weeks because it was "limited by time" and "the ability to work is an issue reserved to the Commissioner" (Tr. 59, 401). Plaintiff fails to explain why the ALJ's explanation

44

did not constitute "good reasons" for rejecting this opinion; however, it is well settled that "the opinion of a treating physician, or any doctor, that the claimant is 'disabled' or 'unable to work' is not controlling, since such statements are not medical opinions, but rather opinions on issues reserved to the Commissioner." O'Dell v. Colvin, 16 Civ. 368 (AJP), 2016 WL 6882861 at *24 (S.D.N.Y. Nov. 22, 2016) (Peck, M.J.) (citations and internal quotation marks omitted); see also Valdez v. Colvin, 232 F. Supp. 3d 543, 553-54 (S.D.N.Y. Feb. 3, 2017) (Gorenstein, M.J.) (no violation of the treating physician rule where the ALJ rejected a treating physician's letter to plaintiff's employer that she was "unable to work" because it was conclusory and did not set forth any specific restrictions); Ingraham v. Colvin, 13-cv-559 (GLS), 2014 WL 3036243 at *2-*5 (N.D.N.Y. July 3, 2014) (no error in assigning "little weight" to plaintiff's primary care doctor's "work excuses" letters "because they were not functional assessments" and opining that plaintiff was unable to work was "reserved to the Commissioner").

Dr. Sodha's March 29, 2016 letter merely requested plaintiff be excused from work for a few weeks and did not contain any specific restrictions, functional assessments or explanation (Tr. 401). Furthermore, Dr. Sodha's examination of plaintiff on March 29, 2016 does not support plaintiff's asser-tion that Dr. Sodha was opining that plaintiff was permanently

45

unable to work. During the March 29 examination, plaintiff exhibited a full range of motion in her fingers and wrists with some weakness in her left thumb, and the record shows that plaintiff never sought treatment from any physician for any ailment after this visit until six months later on September 29, 2016 (Tr. 398, 485). Thus, the ALJ did not violate the treating physician rule by affording "little weight" to this opinion.

With respect to Dr. Sodha's opinion that plaintiff could "never lift/carry any weight", the ALJ also afforded this opinion little weight because, as the ALJ correctly explained, it was not supported by Dr. Sodha's own examination of plaintiff on that date, it was internally inconsistent with his other opinions in his medical source statement and it was inconsistent with the overall record (Tr. 60).

First, on October 25, 2016, plaintiff exhibited a full range of motion in her elbows, shoulders, fingers, forearms and wrists, but reported some pain with wrist and forearm extension (Tr. 426-27). She also exhibited full muscle strength and her sensations and reflexes were normal (Tr. 426-27). Plaintiff attempts to argue that this muscle strength finding of a "5/5" only related to plaintiff's lower extremities and, thus, Dr. Sodha's opinion was not inconsistent with his physical examination of plaintiff (Pl. Memo. at 15). However, the record clearly shows that plaintiff exhibited a "5/5 strength to [her]

46

thenar/intrinsic/extrinsic muscles" -- the muscles that work to control the fine motions of the thumb[33] (Tr. 426). Thus, there is nothing in Dr. Sodha's physical examination of plaintiff on October 25, 2016 to support his opinion that she was unable to lift or carry objects of any weight.

Second, in his medical source statement, Dr. Sodha first opines that plaintiff can never lift or carry objects of any weight and then goes on to opine that she can occasionally reach for and finger objects with both hands and that she can occasionally handle objects with her right hand (Tr. 429, 431). He further opined that plaintiff was able to shop, travel, prepare simple meals and take care of her personal hygiene (Tr. 434). These opinions appear to be internally inconsistent.

Finally, Dr. Sodha's opinion is inconsistent with the record as whole. Treatment notes from Drs. Bassora, Saloman, Jenouri and Mills all indicate that plaintiff had full muscle or full grip strength throughout the relevant period (Tr. 444-45, 376, 292-93, 464, 470, 476). The four other providers who rendered medical opinions on plaintiff's functional capacity found that plaintiff had only "moderate" restrictions on her ability to lift objects, and none found that she was unable to carry or lift objects of any weight (Tr. 294, 453, 459, 477).

---

[33]See Thenar Eminence Overview, Healthline, available at, https://www.healthline.com/health/thenar-eminence (last visited July 11, 2019).

Moreover, Dr. Sodha's opinion is also inconsistent with his own prior opinions that plaintiff had "no restrictions" on August 21, 2014, October 3, 2014 and February 20, 2015 (Tr. 295-96, 414).

Thus, the ALJ provided good reasons for affording this opinion "little weight" and did not violate the treating physician rule.

### b. Duty to Develop the Record

Plaintiff next maintains that the ALJ's RFC finding was erroneous because he failed to obtain medical source statements from Drs. Booker or Husain who plaintiff claims "provided years of progress and treatment notes" (Pl. Memo. at 16-17).

"The ALJ's duty to develop the record includes seeking opinion evidence, usually in the form of medical source statements, from the claimant's treating physicians." Martinez v. Comm'r of Soc. Sec., 16 Civ. 2298 (PGG)(BCM), 2017 WL 9802837 at *13 (S.D.N.Y. Sept. 19, 2017) (Moses, M.J.) (Report & Recommendation), adopted at, 2018 WL 1474405 (S.D.N.Y. Mar. 26, 2018) (Gardephe, D.J.), citing 20 C.F.R. §§ 404.1513(b)(6) (2013), 416.913(b)(6) (2013). However, contrary to plaintiff's allegations, plaintiff visited Dr. Booker for two pain management evaluations -- one on February 26, 2015 and another almost two

years later on November 14, 2016 (Tr. 370, 492).[34]  Plaintiff

also only visited Dr. Husain twice -- once on April 8, 2015 and

once on August 18, 2015 (Tr. 385, 391).  Although there is "no

minimum number of visits required to establish a treating physi-

cian relationship", "[a] physician who has examined a claimant on

one or two occasions is generally not considered a treating

physician."  Nunez v. Berryhill, 16 Civ. 5078 (HBP), 2017 WL

3495213 at *23 (S.D.N.Y. Aug. 11, 2017) (Pitman, M.J.), citing 20

C.F.R. § 404.1527(a)(2) (A treating physician is one who the

claimant has seen "with a frequency consistent with medical

practice for the type of treatment . . . required for [claim-

ant's] medical condition" to establish an "ongoing treatment

relationship" with the claimant.).  Thus, it is highly question-

able whether Drs. Booker and Husain even qualify as treating

physicians under the regulations.

         In any event, remand would still be unwarranted even if

Drs. Booker and Husain were treating physicians because the

record here "contains sufficient evidence from which an ALJ can

assess the [plaintiff's] residual functional capacity."  Tankisi

v. Comm'r of Soc. Sec., 521 F. App'x 29, 34 (2d Cir. 2013)

---

[34]Plaintiff's counsel eventually submitted additional
evidence to the Appeals Council after plaintiff's hearing that
indicates that plaintiff had a follow-up appointments with Dr.
Booker on January 12, 2017, March 7, 2017 and April 17, 2017 and
that Dr. Booker performed a L4-L5 and L5-S1 disc decompression on
plaintiff on May 30, 2017 (Tr. 13-15, 27-29, 35-37, 39).

(summary order). The ALJ reviewed medical source statements and evaluations of plaintiff's functional capacities from at least one treating physician,[35] two consultative physicians and two chiropractors in determining plaintiff's RFC. He also reviewed and considered treatment notes from the other physicians at CRH including Drs. Booker and Husain. This is a far cry from those cases in which the ALJ fails "to obtain any medical source statements at all" and "no consultative examinations were performed." Martinez v. Comm'r of Soc. Sec., supra, 2017 WL 9802837 at *14; see also Swiantek v. Comm'r of Soc. Sec., 588 F. App'x 82, 84 (2d Cir. 2015) (summary order) (holding that "there were no 'obvious gaps' that necessitate[d] remand solely on the ground that the ALJ failed to obtain a formal opinion from one of [plaintiff's] treating physicians" with respect to one functional domain); Tankisi v. Comm'r of Soc. Sec., supra, 521 F. App'x at 34 (remand not required solely on the ground that the ALJ failed to request medical source statements where the record before the ALJ was quite extensive and included an assessment of plaintiff's limitations from a treating physician, as well as, opinions from two separate consulting examiners).

---

[35]By plaintiff's logic here, Dr. Mills should also be considered a treating physician because he examined plaintiff on three separate occasions during the relevant period -- October 16, 2014, December 18, 2014 and March 12, 2015 (Tr. 473, 467, 463).

Accordingly, because the ALJ had sufficient evidence to determine plaintiff's RFC and there are no obvious gaps in the record, remand is unwarranted simply to obtain medical source statements from Drs. Booker and Husain.

### c. Plaintiff's Credibility

Plaintiff next alleges that the ALJ erred in assessing her credibility and failed to evaluate her subjective complaints properly (Pl. Memo. at 17-23).

In Genier v. Astrue, supra, 606 F.3d at 49, the Second Circuit set out the framework an ALJ must follow in assessing the credibility of a plaintiff's subjective complaints when making an RFC finding:

> When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account, 20 C.F.R. § 416.920; see McLaughlin v. Sec'y of Health, Educ. & Welfare, 612 F.2d 701, 704-05 (2d Cir. 1980), but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of claimant's testimony in light of the other evidence in the record. Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1978).

> The regulations provide a two-step process for evaluating a claimant's assertions of pain and other limitations. At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. 20 C.F.R. § 404.1529(b). That requirement stems from the fact that subjective assertions of pain alone cannot ground a finding of disability. 20 C.F.R. § 404,1529(a). If the claimant does suffer from such an impairment, at the second step, the ALJ must consider "the extent to which [the

claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" of record. Id. The ALJ must consider "[s]tatements [the claimant] or others make about [his] impairment(s), [his] restrictions, [his] daily activities, [his] efforts to work, or any other relevant statements [he] make[s] to medical sources during the course of examination or treatment, or to [the agency] during interviews, on applications, in letters, and in testimony in [its] administrative proceedings."

20 C.F.R. § 404.1512(b)(3); see also 20 C.F.R. § 404.1529(a); S.S.R. 96-7p, 1996 WL 374186 at *1 (July 2, 1996). An ALJ's credibility determination is entitled to deference. See Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999) ("After all, the ALJ is in a better position to decide issues of credibility.").

Applying the two-part framework, and referring specifically to SSR 96-7p, supra, the ALJ found that "after careful consideration of the evidence . . . [plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record" (Tr. 58). Specifically, the ALJ found that plaintiff's description of her daily activities was not as limited as one would expect given her claimed symptoms, the record indicated that plaintiff's treatment had largely been "beneficial and successful" and plaintiff displayed

no physical or mental debilitating symptoms while testifying at the hearing[36] (Tr. 58-59).

Plaintiff testified that she was unable to walk, stand or sit for more than five minutes at a time and that she was unable to pick up objects with her left hand or to bend (Tr. 78-81). These limitations appear to be contradicted by plaintiff's description of her daily activities, which included bathing and dressing herself, driving and "light" cooking and cleaning and a 2015 trip to Aruba (Tr. 82-84). Furthermore, the list of plaintiff's daily activities identified at the hearing varied drastically from her description of her daily activities in her Function Report in which she claimed she was able to take care of her dog and grandchild, do laundry, iron and shop (Tr. 229-34). Although plaintiff gave these descriptions more than two years apart, the medical record does not indicate that there was a significant decline in her physical health during that period. Plaintiff's testimony is also undermined by the findings of her treating and consultative physicians who found throughout the relevant period that plaintiff exhibited full grip strength,

_____

[36]The ALJ also stated that "the record does not contain any non-conclusory opinions, supported by clinical or laboratory evidence, from treating or examining physicians indicating that [plaintiff] is currently disabled" as a reason for not wholly crediting plaintiff's statements regarding the extent of her symptoms (Tr. 59). This finding is supported by substantial evidence as discussed above at page 39-42.

normal reflexes and had only "mild to moderate" limitations with respect to prolonged sitting, standing or walking.

As already discussed above, the record also indicates that plaintiff's treatment was "beneficial and successful." Dr. Sodha performed surgery on plaintiff's left thumb on June 9, 2014 (Tr. 284-85, 357-59) and this surgical repair appeared to be successful considering plaintiff exhibited full range of motion in her wrists and fingers at follow-up appointments with Dr. Sodha on July 24, 2014, August 21, 2014, October 3, 2014, February 20, 2015, October 6, 2015, January 19, 2016 and March 29, 2016 (Tr. 297, 296, 295, 414, 411, 405, 398). Dr. Sodha consistently opined that plaintiff had "no restrictions" after her examinations on August 21, 2014, October 3, 2014 and February 20, 2015 (Tr. 295-96, 414). Plaintiff's May 10, 2016 left wrist MRI also revealed no fractures, joint effusion or lesions (Tr. 422).

Dr. Bassora subsequently surgically repaired plaintiff's medial meniscus tear on August 26, 2014 (Tr. 367). While plaintiff reported some residual pain and decreased sensations from this surgery, she reported no difficulty walking and she exhibited full muscle strength and normal reflexes in her knee at subsequent consultative examinations on September 19, 2014, October 15, 2014, October 16, 2014, December 18, 2014, December 23, 2014 and March 12, 2015 (Tr. 293, 437-38, 452-53, 458, 464,

470, 476).  Notably, plaintiff also never sought additional treatment from Dr. Bossora or any other orthopedic surgeon specifically for her left knee after this surgery.  Plaintiff also reported that physical and occupational therapy were alleviating her pain and improving the range of motion in her hands and knees, and that the epidural cortisone injections provided her with almost complete pain relief in her back.

Finally, it was not an error for the ALJ to consider plaintiff's mental and physical demeanor during the hearing.  The Second Circuit has explicitly held that an ALJ may "take account of a claimant's physical demeanor in weighing the credibility of her testimony as to physical disability" so long as this observation is given "limited weight" and is "one of several factors in evaluating credibility."  Schaal v. Apfel, supra, 134 F.3d at 502.  "Thus, the ALJ, 'after weighing objective medical evidence, the claimant's demeanor, and other indicia of credibility . . . may decide to discredit the claimant's subjective estimation of the degree of impairment.'"  Valdez v. Colvin, 232 F. Supp. 3d 543, 552 (S.D.N.Y. 2017) (Gorenstein, M.J.), quoting Tejada v. Apfel, supra, 167 F.3d at 775-76.  In fact, "[d]eference should be accorded the ALJ's [credibility] determination because he heard plaintiff's testimony and observed [her] demeanor."  Gernavage v. Shalala, 882 F. Supp. 1413, 1419 n.6 (S.D.N.Y. 1995) (Leisure, D.J.); accord Jones v. Comm'r of Soc. Sec., 14 Civ.

7856 (KBF), 2016 WL 6248443 at *9 (S.D.N.Y. Oct. 26, 2016)
(Forrest, D.J.); Gomez v. Comm'r of Soc. Sec., 14 Civ. 7207
(PAE)(FM), 2016 WL 3938161 at *14 (S.D.N.Y. July 18, 2016)
(Engelmayer, D.J.).

The ALJ noted that "[w]hile the hearing was short-lived
and cannot be considered a conclusive indicator of the [plain-
tiff's] overall level of functioning on a day-to-day basis, the
apparent lack of debilitating symptoms during the hearing is a
permissible factor to consider amongst other factors in reaching
the conclusion regarding the credibility of the [plaintiff's]
allegations and the [plaintiff's] residual functional capacity"
(Tr. 59). Thus, the ALJ's assessment of plaintiff's demeanor
during the hearing was entirely proper based on the legal
principles outlined above.[37]

---

[37]Plaintiff also argues that because the ALJ's RFC finding
was deficient, "the hypotheticals proffered to the Vocational
Expert (VE) at Step Five of the analysis [were] inaccurate and
incomplete and therefore the [ALJ's] decision [was] not supported
by substantial evidence" (Pl. Memo. at 25). Plaintiff's argument
is simply a rehashing her previous challenges to the ALJ's RFC
analysis. As already discussed at length above, the ALJ's RFC
finding was not deficient and was supported by substantial
evidence. The ALJ's hypothetical posed to the VE mirrored the
ALJ's RFC finding exactly, and the VE found that jobs in the
national economy existed that such hypothetical individuals could
perform (Tr. 91-92). Thus, the hypotheticals posed to the VE
were proper and her testimony was not flawed.

2.  New Evidence

Plaintiff submitted additional medical records from CRH after the ALJ's decision on April 7, 2017, but prior to the Appeals Council's denial on February 20, 2018 (Tr. 8-47).  These records included (1) a November 22, 2016 MRI of plaintiff's lumbar spine that revealed mild disc bulging at L4-L5 and L5-S1 and an annular tear at L5-S1; (2) an operative report from Dr. Sodha who performed surgery on plaintiff's right wrist to repair a suspected TFCC tear on November 30, 2016 and treatment notes from follow-up appointments on December 9, 2016, December 30, 2016 and April 21, 2017; (3) treatment notes from appointments with Dr. Booker on January 12, March 6 and April 17, 2017; (4) functional capacity assessments from Dr. Sodha from January 16 and June 20, 2017 and (5) an operative report from Dr. Booker who performed a disc decompression procedure on plaintiff on May 23, 2017 (Tr. 8-47).

The Appeals Council found that the CRH records from November 30, 2016 through April 7, 2017 did "not show a reasonable probability that [they] would [have] changed the outcome of [the ALJ's] decision" and that the CRH records post-April 7, 2017 did not relate to the period at issue because such evidence related to the period after the ALJ's decision (Tr. 2).

Plaintiff argues for the first time in her reply brief that "the Appeals Council failed to provide good reasons for the

57

determination made on the medical evidence provided to it subsequent to the hearing" and, thus, remand is warranted (Plaintiff's Reply Memorandum of Law in Opposition to Defendant's Cross-Motion and in Further Support of Plaintiff's Motion for Judgment on the Pleadings, dated Dec. 4, 2018 (D.I. 17) ("Pl. Reply") at 2-3). Generally, new arguments cannot be asserted for the first time in reply papers and arguments first made in reply should not be considered. Brown v. Ionescu, 380 F. App'x 71, 72 n.1 (2d Cir. 2010) (summary order); Pointdujour v. Mount Sinai Hosp., 121 F. App'x 895, 896 n.1 (2d Cir. 2005) (summary order); Pruitt v. Kirkpatrick, 16 Civ. 2703 (JMF), 2017 WL 4712225 at *3 n.2 (S.D.N.Y. Oct. 18, 2017) (Furman, D.J.); Farmer v. United States, 15 Civ. 6287 (AJN), 2017 WL 3448014 at *2 (S.D.N.Y. Aug. 10, 2017) (Nathan, D.J.); United States v. Radin, No. S1 16 CR. 528 (HBP), 2017 WL 2226595 at *4 (S.D.N.Y. May 22, 2017) (Pitman, M.J.).

In any event, remand is not required because of this additional evidence. "The Act sets a stringent standard for remanding based on new evidence alone" requiring that the new evidence must be (1) "relevant to the claimant's condition during the time period for which benefits were denied"; (2) "probative" and (3) of such substance that "there is 'a reasonable possibility that the new evidence would have influenced the Commissioner to decide claimant's application differently.'" Diaz v. Colvin,

14 Civ. 2277 (KPF), 2015 WL 4402941 at *17 (S.D.N.Y. July 19, 2015) (Failla, D.J.), quoting Pollard v. Halter, 377 F.3d 183, 193 (2d Cir. 2004).

With respect to the medical records that relate to plaintiff's treatment after April 7, 2017, the Appeals Council correctly found that this evidence was not relevant to the time period for which benefits were denied because it post-dates the ALJ's decision. See Diaz v. Colvin, supra, 2015 WL 4402941 at *17. With respect to the medical records that relate to treatment prior to April 7, 2017,[38] while this evidence is relevant to plaintiff's condition during the relevant time period, there is not a reasonable possibility that it would have changed the ALJ's decision.

The November 22, 2016 MRI revealed mild disc bulging at L4-L5 and L5-S1, but no significant disc herniations or central canal stenosis (Tr. 38). At plaintiff's follow-up appointments with Dr. Booker on January 12 and March 6, 2017, she exhibited full range of motion in her lower extremities and her straight leg raising tests were negative (Tr. 33-37). Dr. Booker also

---

[38]These records also include treatment notes from an appointment with Dr. Shane Baker on December 16, 2016 in which plaintiff reported foot and ankle pain and was diagnosed with plantar fascitis (Tr. 43-44). As this is an entirely new complaint separate and apart from plaintiff's other impairments, I find it is neither probative, nor relevant, to her condition with respect to the ALJ's disability determination.

administered a steroid injection to plaintiff on March 7, 2017, which provided her with pain relief (Tr. 39-40).

With respect to plaintiff's hand and wrist impairments, Dr. Sodha performed surgery on plaintiff's right wrist on November 30, 2016 (Tr. 45-47). Similar to the procedure Dr. Sodha performed on plaintiff's left hand, this procedure appears to have been successful considering that plaintiff exhibited a good range of motion in her fingers at follow-up appointments with Dr. Sodha on December 9 and December 30, 2016 (Tr. 21-24). Dr. Sodha also noted that plaintiff had a fair range of motion in her right wrist, that her thenar muscle strength was intact and that she was recovering well from the surgery (Tr. 21-24). These findings are consistent with the ALJ's RFC finding that plaintiff could perform light work and, thus, would not likely have changed his disability decision.

Dr. Sodha also completed a two-page functional capacity form for plaintiff on January 16, 2017 (Tr. 25-26). Although Dr. Sodha checked a box on that form indicating that plaintiff was "disabled", he failed to fill out any other sections on the form to indicate what exertion level plaintiff was capable of working at, how long she could sit or stand or any other specific functional limitations, other than indicating that plaintiff could use her left hand for repetitive motions, but not her right hand (Tr. 25-26). Even if this assessment had been before the ALJ at

the time of his decision, it would have been proper for the ALJ

to reject Dr. Sodha's opinion that plaintiff was disabled because

it was unsupported by any explanation, medical findings or

functional limitation assessments, and, as discussed above, a

treating physician's "opinion that plaintiff appeared permanently

disabled and unable to do any work is a conclusion of law specif-

ically reserved to the judgment of the Commissioner." Harris v.

Astrue, 935 F. Supp. 2d 603, 609 (W.D.N.Y. 2013), aff'd, 561 F.

App'x 81 (2d Cir. 2014).  The only probative medical opinion

given by Dr. Sodha in this statement is that plaintiff could not

use her right hand for repetitive motions, which is not inconsis-

tent with the opinions of plaintiff's consultative physicians or

the ALJ's RFC finding because he limited plaintiff to only

occasionally handling and fingering objects with her right hand

(Tr. 55-56).

Thus, remand is not required solely for consideration

of this new evidence.

IV.  Conclusion

Accordingly, for all the foregoing reasons, the

Commissioner's motion for judgment on the pleadings is granted

and plaintiff's motion is denied.  The Clerk of the Court is

respectfully requested to mark D.I. 12 and D.I. 15 closed, and respectfully requested to close the case.

Dated: New York, New York
       July 24, 2019

SO ORDERED

HENRY PITMAN
United States Magistrate Judge

Copies transmitted to

All Counsel